# MASSACHUSETTS MUTUAL LIFE INSURANCE CO.
## ET AL. *v.* RUSSELL

No. 84–9.  Argued January 16, 1985—Reargued April 24, 1985—Decided
June 27, 1985

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which WHITE, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 148.

*John E. Nolan, Jr.*, reargued the cause for petitioners. With him on the briefs were *Paul J. Ondrasik, Jr., Antonia B. Ianniello, Richard T. Davis, Jr.*, and *David L. Bacon.*

*Brad N. Baker* reargued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the Alaska Fishermen's Union-Salmon Canners Pension Trust et al. by *Thomas J. Hart* and *Richard P. Donaldson;* for the American Council of Life Insurance and Health Insurance Association of America by *Erwin N. Griswold, Jack H. Blaine,* and *Edward J. Zimmerman;* for the Board of Trustees of the Northern California Carpenters Trust Funds et al. by *Thomas E. Stanton* and *Donald S. Tayer;* for the Motion Picture Health and Welfare Fund by *William L. Cole;* for the Pipe Trust et al. by *Stuart H. Young, Jr.;* for the Construction Laborers Pension Trust for Southern California et al. by *James P. Watson, George M. Cox, John S. Miller, Jr.*, and *Lionel Richman.*

*Carl B. Frankel* and *Bernard Kleiman* filed a brief for the United Steelworkers of America, AFL–CIO: CLC, as *amicus curiae* urging affirmance.

JUSTICE STEVENS delivered the opinion of the Court.

The question presented for decision is whether, under the Employee Retirement Income Security Act of 1974 (ERISA), a fiduciary to an employee benefit plan may be held personally liable to a plan participant or beneficiary for extra-contractual compensatory or punitive damages caused by improper or untimely processing of benefit claims.

Respondent Doris Russell, a claims examiner for petitioner Massachusetts Mutual Life Insurance Company (hereafter petitioner), is a beneficiary under two employee benefit plans administered by petitioner for eligible employees. Both plans are funded from the general assets of petitioner and both are governed by ERISA.

In May 1979 respondent became disabled with a back ailment. She received plan benefits until October 17, 1979, when, based on the report of an orthopedic surgeon, petitioner's disability committee terminated her benefits. On October 22, 1979, she requested internal review of that decision and, on November 27, 1979, submitted a report from her own psychiatrist indicating that she suffered from a psychosomatic disability with physical manifestations rather than an orthopedic illness. After an examination by a second psychiatrist on February 15, 1980, had confirmed that respondent was temporarily disabled, the plan administrator reinstated her benefits on March 11, 1980. Two days later retroactive benefits were paid in full.[1]

Although respondent has been paid all benefits to which she is contractually entitled, she claims to have been injured by the improper refusal to pay benefits from October 17, 1979, when her benefits were terminated, to March 11, 1980, when her eligibility was restored. Among other allegations, she asserts that the fiduciaries administering petitioner's employee benefit plans are high-ranking company officials who

---

[1] Respondent later qualified for permanent disability benefits which have been regularly paid.

(1) ignored readily available medical evidence documenting respondent's disability, (2) applied unwarrantedly strict eligibility standards, and (3) deliberately took 132 days to process her claim, in violation of regulations promulgated by the Secretary of Labor.[2] The interruption of benefit payments allegedly forced respondent's disabled husband to cash out his retirement savings which, in turn, aggravated the psychological condition that caused respondent's back ailment. Accordingly, she sued petitioner in the California Superior Court pleading various causes of action based on state law and on ERISA.

Petitioner removed the case to the United States District Court for the Central District of California and moved for summary judgment. The District Court granted the motion, holding that the state-law claims were pre-empted by ERISA and that "ERISA bars any claims for extra-contractual damages and punitive damages arising out of the original denial of plaintiff's claims for benefits under the Salary Continuance Plan and the subsequent review thereof." App. to Pet. for Cert. 29a.

On appeal, the United States Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. 722 F. 2d 482 (1983). Although it agreed with the District Court that respondent's state-law causes of action were pre-empted by ERISA, it held that her complaint alleged a cause of action under ERISA. See id., at 487–492. The court reasoned that the 132 days[3] petitioner took to process respondent's claim violated the fiduciary's obligation to process claims in good faith and in a fair and diligent manner. Id., at

---

[2] The regulations, which are authorized by §§ 503, 505, 88 Stat. 893–894, 29 U. S. C. §§ 1133, 1135, appear at 29 CFR § 2560.503–1(h) (1984). We discuss them infra, at 144, and n. 11.

[3] Petitioner argues that the review period should be measured from November 27, 1979, when respondent submitted her medical evidence, rather than from October 22, 1979, the date she requested review, but for purposes of our decision we accept respondent's position on this point.

488. The court concluded that this violation gave rise to a cause of action under § 409(a) that could be asserted by a plan beneficiary pursuant to § 502(a)(2). *Id.*, at 489–490. It read the authorization in § 409(a) of "such other equitable or remedial relief as the court may deem appropriate" as giving it "wide discretion as to the damages to be awarded," including compensatory and punitive damages. *Id.*, at 490–491.

According to the Court of Appeals, the award of compensatory damages shall "remedy the wrong and make the aggrieved individual whole," which meant not merely contractual damages for loss of plan benefits, but relief "that will compensate the injured party for all losses and injuries sustained as a direct and proximate cause of the breach of fiduciary duty," including "damages for mental or emotional distress." *Id.*, at 490. Moreover, the liability under § 409(a) "is against the fiduciary personally, not the plan." *Id.*, at 490, n. 8.

The Court of Appeals also held that punitive damages could be recovered under § 409(a), although it decided that such an award is permitted only if the fiduciary "acted with actual malice or wanton indifference to the rights of a participant or beneficiary." *Id.*, at 492. The court believed that this result was supported by the text of § 409(a) and by the congressional purpose to provide broad remedies to redress and prevent violations of the Act.

We granted certiorari, 469 U. S. 816 (1984), to review both the compensatory and punitive components of the Court of Appeals' holding that § 409 authorizes recovery of extracontractual damages.[4] Respondent defends the judgment of the Court of Appeals both on its reasoning that § 409 provides an express basis for extracontractual damages, as well as by arguing that in any event such a private remedy should be inferred under the analysis employed in *Cort* v. *Ash*, 422 U. S. 66, 78 (1975). We reject both arguments.

---

[4] Respondent did not file a cross-petition and therefore has not questioned the Court of Appeals' holding that her state-law causes of action are pre-empted by ERISA.

## I

As its caption implies, § 409(a) establishes "LIABILITY FOR BREACH OF FIDUCIARY DUTY."[5] Specifically, it provides:

"(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 411 of this Act."[6] 88 Stat. 886, 29 U. S. C. § 1109(a).

Sections 501 and 502 authorize, respectively, criminal and civil enforcement of the Act. While the former section provides for criminal penalties against any person who willfully violates any of the reporting and disclosure requirements of the Act,[7] the latter section identifies six types of civil actions

---

[5] Because respondent relies entirely on § 409(a), and expressly disclaims reliance on § 502(a)(3), we have no occasion to consider whether any other provision of ERISA authorizes recovery of extracontractual damages. Tr. Oral Arg. 31–32.

[6] Section 411 prohibits any person who has been convicted of certain enumerated offenses from serving as an administrator or fiduciary of a regulated plan. See 88 Stat. 887, 29 U. S. C. § 1111.

[7] Section 501 reads as follows:

"Any person who willfully violates any portion of part 1 of this subtitle, or any regulation or order issued under any such provision, shall upon conviction be fined not more than $5,000 or imprisoned not more than one year, or both; except that in the case of such violation by a person not an individual, the fine imposed upon such person shall be a fine not exceeding $100,000." 88 Stat. 891, 29 U. S. C. § 1131.

Part 1 of the subtitle, which consists of §§ 101–111, imposes elaborate reporting and disclosure requirements on plan administrators. See 88 Stat. 840–851, 29 U. S. C. §§ 1021–1031.

that may be brought by various parties. Most relevant to our inquiry is § 502(a), which provides in part:

"A civil action may be brought —

"(1) by a participant or beneficiary —

"(A) for the relief provided for in subsection (c) of this section, or

"(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

"(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409 . . . ." 88 Stat. 891, 29 U. S. C. § 1132(a).

There can be no disagreement with the Court of Appeals' conclusion that § 502(a)(2) authorizes a beneficiary to bring an action against a fiduciary who has violated § 409. Petitioner contends, however, that recovery for a violation of § 409 inures to the benefit of the plan as a whole. We find this contention supported by the text of § 409, by the statutory provisions defining the duties of a fiduciary, and by the provisions defining the rights of a beneficiary.

The Court of Appeals' opinion focused on the reference in § 409 to "such other equitable or remedial relief as the court may deem appropriate." But when the entire section is examined, the emphasis on the relationship between the fiduciary and the plan as an entity becomes apparent. Thus, not only is the relevant fiduciary relationship characterized at the outset as one "with respect to a plan," but the potential personal liability of the fiduciary is "to make good *to such plan* any losses *to the plan* . . . and to restore *to such plan* any profits of such fiduciary which have been made through use of assets *of the plan* . . . ."[8]

---

[8] The Committee Reports also emphasize the fiduciary's personal liability for losses *to the plan.* See H. R. Conf. Rep. No. 93–1280, p. 320 (1974),

To read directly from the opening clause of § 409(a), which identifies the proscribed acts, to the "catchall" remedy phrase at the end—skipping over the intervening language establishing remedies benefiting, in the first instance, solely

reprinted in 3 Subcommittee on Labor and Public Welfare of the Senate Committee on Labor and Public Welfare, 94th Cong., 2d Sess., Legislative History of the Employee Retirement Income Security Act of 1974, p. 4587 (Comm. print 1976) (hereinafter Leg. Hist.); S. Rep. No. 93–383, pp. 8, 32, 105 (1973), 1 Leg. Hist. 1076, 1100, 1173; S. Rep. No. 93–127, p. 33 (1973), 1 Leg. Hist. 619.

The floor debate also reveals that the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future. See 120 Cong. Rec. 29932 (1974) ("[T]he legislation imposes strict fiduciary obligations on those who have discretion or responsibility respecting the management, handling, or disposition of pension or welfare plan assets") (remarks of Sen. Williams), reprinted in 3 Leg. Hist. 4743; 120 Cong. Rec. 29951 (1974) ("This bill will establish judicially enforceable standards to insure honest, faithful, and competent management of pension and welfare funds") (remarks of Sen. Bentsen), reprinted in 3 Leg. Hist. 4795; 120 Cong. Rec. 29954 (1974) ("[I]nstances have arisen in which pension funds have been used improperly by plan managers and fiduciaries. . . . [T]his bill contains measures designed to reduce substantially the potentialities for abuse") (remarks of Sen. Nelson), reprinted in 3 Leg. Hist. 4803; 120 Cong. Rec. 29957 (1974) ("In addition, frequently the pension funds themselves are abused by those responsible for their management who manipulate them for their own purposes or make poor investments with them") (remarks of Sen. Ribicoff), reprinted in 3 Leg. Hist. 4811; 120 Cong. Rec. 29957 (1974) ("[M]isuse, manipulation, and poor management of pension trust funds are all too frequent") (remarks of Sen. Ribicoff), reprinted in 3 Leg. Hist. 4812; 120 Cong. Rec. 29961 (1974) ("This legislation . . . sets fiduciary standards to insure that pension funds are not mismanaged") (remarks of Sen. Clark), reprinted in 3 Leg. Hist. 4823; 120 Cong. Rec. 29194 (1974) (ERISA contains "provisions to insure fair handling of a worker's money") (remarks of Rep. Biaggi), reprinted in 3 Leg. Hist. 4661; 120 Cong. Rec. 29196–29197 (1974) ("These standards . . . will prevent abuses . . . by those dealing with plans") (remarks of Rep. Dent), reprinted in 3 Leg. Hist. 4668; 120 Cong. Rec. 29206 (1974) (ERISA imposes "fiduciary and disclosure standards to guard against fraud and abuse of pension funds") (remarks of Rep. Brademas), reprinted in 3 Leg. Hist. 4694.

the plan—would divorce the phrase being construed from its context and construct an entirely new *class* of relief available to entities other than the plan. Cf. *FMC* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 734 (1973); *United States* v. *Jones*, 131 U. S. 1, 19 (1889). This "blue pencil" method of statutory interpretation—omitting all words not part of the clauses deemed pertinent to the task at hand—impermissibly ignores the relevant context in which statutory language subsists. See *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961). In this case, this mode of interpretation would render superfluous the preceding clauses providing relief singularly to the plan, and would slight the language following after the phrase "such other equitable or remedial relief." Congress specified that this remedial phrase includes "removal of such fiduciary"—an example of the kind of "plan-related" relief provided by the more specific clauses it succeeds. A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.[9]

It is of course true that the fiduciary obligations of plan administrators are to serve the interest of participants and beneficiaries and, specifically, to provide them with the benefits authorized by the plan. But the principal statutory duties imposed on the trustees relate to the proper management, administration, and investment of fund assets, the maintenance of proper records, the disclosure of specified in-

---

[9] Consistent with this objective, § 502(a)(2), the enforcement provision for § 409, authorizes suits by four classes of party-plaintiffs: the Secretary of Labor, participants, beneficiaries, and fiduciaries. Inclusion of the Secretary of Labor is indicative of Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes is in the financial integrity of the plan.

formation, and the avoidance of conflicts of interest.[10] Those duties are described in Part 4 of Title 1 of the Act, which is entitled "FIDUCIARY RESPONSIBILITY," see §§ 401–414, 88 Stat. 874–890, 29 U. S. C. §§ 1101–1114, whereas the statutory provisions relating to claim procedures are found in Part 5, dealing with "ADMINISTRATION AND ENFORCEMENT." §§ 502(a), 503, 88 Stat. 891, 893, 29 U. S. C. §§ 1132(a), 1133. The only section that concerns review of a claim that has been denied—§ 503—merely specifies that every plan shall comply with certain regulations promulgated by the Secretary of Labor.[11]

---

[10] Accordingly, ERISA establishes duties of loyalty and care for fiduciaries. With regard to loyalty, the principal provision is § 406, which in general prohibits self-dealing and sales or exchanges between the plan, on the one hand, and "parties in interest" and "disqualified persons," on the other. See 88 Stat. 879–880, 29 U. S. C. § 1106. In the same vein, § 408(c)(2) prohibits compensating fiduciaries who are full-time employees of unions or employers. 88 Stat. 885, 29 U. S. C. § 1108(c)(2).

With regard to the duty of care, § 404, among other obligations, imposes a "prudent person" standard by which to measure fiduciaries' investment decisions and disposition of assets. See 88 Stat. 877, 29 U. S. C. § 1104(a)(1)(B). Section 404 also mandates that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries." 88 Stat. 877, 29 U. S. C. § 1104(a)(1).

[11] Section 503 provides:

"In accordance with regulations of the Secretary, every employee benefit plan shall—

"(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

"(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 88 Stat. 893, 29 U. S. C. § 1133.

The Secretary of Labor's rulemaking power is contained in § 505, 88 Stat. 894, 29 U. S. C. § 1135.

The Secretary's regulations contemplate that a decision "shall be made promptly, and shall not ordinarily be made later than 60 days after the plan's receipt of a request for review, unless special circumstances . . . require an extension of time for processing, in which case a decision shall be rendered as soon as possible, but not later than 120 days after receipt of a request for review." 29 CFR § 2560.503–1(h)(1)(i) (1984). Nothing in the regulations or in the statute, however, expressly provides for a recovery from either the plan itself or from its administrators if greater time is required to determine the merits of an application for benefits. Rather, the regulations merely state that a claim may be treated as having been denied after the 60- or 120-day period has elapsed. See § 2560.503–1(h)(4) ("If the decision on review is not furnished within such time, the claim shall be *deemed* denied on review" (emphasis added)). This provision therefore enables a claimant to bring a civil action to have the merits of his application determined, just as he may bring an action to challenge an outright denial of benefits.

Significantly, the statutory provision explicitly authorizing a beneficiary to bring an action to enforce his rights under the plan—§ 502(a)(1)(B), quoted *supra*, at 140—says nothing about the recovery of extracontractual damages, or about the possible consequences of delay in the plan administrators' processing of a disputed claim. Thus, there really is nothing at all in the statutory text to support the conclusion that such a delay gives rise to a private right of action for compensatory or punitive relief. And the entire text of § 409 persuades us that Congress did not intend that section to authorize any relief except for the plan itself. In short, unlike the Court of Appeals, we do not find in § 409 express authority for an award of extracontractual damages to a beneficiary.[12]

---

[12] In light of this holding, we do not reach any question concerning the extent to which § 409 may authorize recovery of extracontractual compensatory or punitive damages from a fiduciary by a *plan*.

## II

Relying on the four-factor analysis employed by the Court in *Cort* v. *Ash*, 422 U. S., at 78,[13] respondent argues that a private right of action for extracontractual damages should be implied even if it is not expressly authorized by ERISA. Two of the four *Cort* factors unquestionably support respondent's claim: respondent is a member of the class for whose benefit the statute was enacted and, in view of the pre-emptive effect of ERISA, there is no state-law impediment to implying a remedy. But the two other factors—legislative intent and consistency with the legislative scheme—point in the opposite direction. And "unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 94 (1981). "The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *California* v. *Sierra Club*, 451 U. S. 287, 297 (1981).

The voluminous legislative history of the Act contradicts respondent's position. It is true that an early version of the

---

[13] "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33, 39 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corporation* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 458, 460 (1974) *(Amtrak)*. Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort* v. *Ash*, 422 U. S., at 78 (citations omitted).

statute contained a provision for "legal or equitable" relief that was described in both the Senate and House Committee Reports as authorizing "the full range of legal and equitable remedies available in both state and federal courts." H. R. Rep. No. 93–533, p. 17 (1973), 2 Leg. Hist. 2364; S. Rep. No. 93–127, p. 35 (1973), 1 Leg. Hist. 621. But that language appeared in Committee Reports describing a version of the bill before the debate on the floor and before the Senate-House Conference Committee had finalized the operative language.[14] In the bill passed by the House of Representatives and ultimately adopted by the Conference Committee the reference to legal relief was deleted. The language relied on by respondent and by the Court of Appeals below, therefore, is of little help in understanding whether Congress intended to make fiduciaries personally liable to beneficiaries for extracontractual damages.

The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted, however, provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a "comprehensive and reticulated statute." *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 361 (1980). If in this case, for example, the plan administrator had adhered to his initial determination that respondent was not entitled to disability benefits under the plan, respondent would have had a panoply of remedial devices at her disposal. To recover the

---

[14] This provision, which was part of H. R. 2 as passed by the Senate, provided for "[c]ivil actions for appropriate relief, legal or equitable, to redress or restrain a breach of any responsibility, obligation, or duty of a fiduciary." H. R. 2, § 693, 93d Cong., 2d Sess. (Mar. 4, 1974), 3 Leg. Hist. 3816. (It was also part of earlier bills. See S. 4, § 603, 93d Cong., 1st Sess. (Apr. 18. 1973), 1 Leg. Hist. 579; see also S. 1179, § 501(d), 93d Cong., 1st Sess. (Aug. 21, 1973), 1 Leg. Hist. 950.)

benefits due her, she could have filed an action pursuant to § 502(a)(1)(B) to recover accrued benefits, to obtain a declaratory judgment that she is entitled to benefits under the provisions of the plan contract, and to enjoin the plan administrator from improperly refusing to pay benefits in the future. If the plan administrator's refusal to pay contractually authorized benefits had been willful and part of a larger systematic breach of fiduciary obligations, respondent in this hypothetical could have asked for removal of the fiduciary pursuant to §§ 502(a)(2) and 409. Finally, in answer to a possible concern that attorney's fees might present a barrier to maintenance of suits for small claims, thereby risking underenforcement of beneficiaries' statutory rights, it should be noted that ERISA authorizes the award of attorney's fees. See § 502(g), 88 Stat. 892, as amended, 29 U. S. C. § 1132(g)(1).

We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA. As we stated in *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 19 (1979): "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." See also *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 571–574 (1979). "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S., at 97.[15]

---

[15] See *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 14–15 (1981); *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 639–640 (1981); *California* v. *Sierra Club*, 451 U. S. 287, 295, n. 6 (1981); *National Railroad Passenger Corporation* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 458 (1974); *Nashville Milk Co.* v. *Carnation Co.*, 355 U. S. 373, 375–376 (1958); *Switchmen* v. *National Mediation Board*, 320 U. S. 297, 301 (1943); *Botany Worsted Mills* v. *United States*, 278 U. S. 282, 289 (1929).

In contrast to the repeatedly emphasized purpose to protect contractually defined benefits,[16] there is a stark absence—in the statute itself and in its legislative history—of any reference to an intention to authorize the recovery of extracontractual damages.[17] Because "neither the statute nor the legislative history reveals a congressional intent to create a private right of action . . . we need not carry the *Cort* v. *Ash* inquiry further." *Northwest Airlines, Inc.* v. *Transport Workers,* 451 U. S., at 94, n. 31.

### III

Thus, the relevant text of ERISA, the structure of the entire statute, and its legislative history all support the conclusion that in § 409(a) Congress did not provide, and did not intend the judiciary to imply, a cause of action for extracontractual damages caused by improper or untimely processing of benefit claims.

The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, concurring in the judgment.

Section 502(a) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1132(a), provides a wide array of measures to employee-benefit plan participants and beneficiaries by which they may enforce their rights under ERISA and under the terms of their plans. A partici-

---

[16] See, *e. g., Nachman Corp.* v. *Pension Benefit Guaranty Corporation,* 446 U. S. 359, 374–375 (1980); 120 Cong. Rec. 29196 (1974), 3 Leg. Hist. 4665; 119 Cong. Rec. 30041 (1973), 2 Leg. Hist. 1633.

[17] Indeed, Congress was concerned lest the cost of federal standards discourage the growth of private pension plans. See, *e. g.,* H. R. Rep. No. 93–533, 1, 9 (1973), 2 Leg. Hist. 2348, 2356; 120 Cong. Rec. 29949 (1974), 3 Leg. Hist. 4791; 120 Cong. Rec. 29210–29211 (1974), 3 Leg. Hist. 4706–4707.

pant or beneficiary may file a civil action, for example, (1) "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," § 502(a)(1)(B); (2) "for appropriate relief under section 409," § 502(a)(2); and (3) "to enjoin any act or practice which violates any provision of this title or the terms of the plan, or . . . to obtain *other appropriate equitable relief . . . to redress such violations,*" § 502(a)(3) (emphasis added).[1]

This case presents a single, narrow question: whether the § 409 "appropriate relief" referred to in § 502(a)(2) includes individual recovery by a participant or beneficiary of extra-contractual damages for breach of fiduciary duty. The Court of Appeals for the Ninth Circuit held that, because § 409 broadly authorizes "such other equitable or remedial relief as the court may deem appropriate,"[2] participants and benefi-

---

[1] Section 502(a), 88 Stat. 891, 29 U. S. C. § 1132(a), provides in full:

"A civil action may be brought—

"(1) by a participant or beneficiary—

"(A) for the relief provided for in subsection (c) of this section, or

"(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

"(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409;

"(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;

"(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of [section] 105(c);

"(5) except as otherwise provided in subsection (b), by the Secretary (A) to enjoin any act or practice which violates any provision of this title, or (b) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this title; or

"(6) by the Secretary to collect any civil penalty under subsection (i)."

[2] Section 409, 88 Stat. 886, 29 U. S. C. § 1109, provides:

"(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries

ciaries may recover such damages under that section. 722 F. 2d 482, 488–489 (1983). I agree with the Court's decision today that § 409 is more fairly read in context as providing "remedies that would protect the entire plan" rather than individuals, *ante*, at 142, and that participants and beneficiaries accordingly must look elsewhere in ERISA for personal relief. Indeed, since § 502(a)(3) already provides participants and beneficiaries with "other appropriate equitable relief . . . to redress [ERISA] violations," there is no reason to construe § 409 expansively in order to bring these individuals under the penumbra of "equitable or remedial relief."

This does not resolve, of course, whether and to what extent extracontractual damages are available under § 502(a)(3). This question was not addressed by the courts below and was not briefed by the parties and *amici*. Thus the Court properly emphasizes that "we have no occasion to consider whether any other provision of ERISA authorizes recovery of extracontractual damages." *Ante*, at 139, n. 5. Accordingly, we save for another day the questions (1) to what extent a fiduciary's mishandling of a claim might constitute an actionable breach of the fiduciary duties set forth in § 404(a), and (2) the nature and extent of the "appropriate equitable relief . . . to redress" such violations under § 502(a)(3).

There is dicta in the Court's opinion, however, that could be construed as sweeping more broadly than the narrow ground of resolution set forth above. Although the Court

---

by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 411 of this Act.

"(b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this title if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary."

takes care to limit the binding effect of its decision to the terms of § 409,[3] its opinion at some points seems to speak generally of whether fiduciaries ever may be held personally liable to beneficiaries for extracontractual damages.[4]  Moreover, some of the Court's remarks are simply incompatible with the structure, legislative history, and purposes of ERISA.  The Court's ambiguous discussion is certainly subject to different readings, and in any event is without controlling significance beyond the question of relief under § 409.  I write separately to outline what I believe is the proper approach for courts to take in construing ERISA's provisions and to emphasize the issues left open under today's decision.

*Fiduciary Duties in Claims Administration*

There is language in the Court's opinion that might be read as suggesting that the fiduciary duties imposed by ERISA on plan administrators for the most part run only to the plan itself, as opposed to individual beneficiaries.  See *ante,* at 142–144.  The Court apparently thinks there might be some significance in the fact that an administrator's fiduciary duties "are described in Part 4 of Title 1 of the Act . . . whereas the statutory provisions relating to claim procedures are found in Part 5."  *Ante,* at 143.  Accordingly, the Court seems to believe that the duties and remedies associated with claims processing might be restricted to those explicitly spelled out in §§ 502(a)(1)(B) and 503.  *Ante,* at 142–144.

To the extent the Court suggests that administrators might not be fully subject to strict fiduciary duties to participants and beneficiaries in the processing of their claims and

---

[3] See, *e. g., ante,* at 138 ("We granted certiorari . . . to review both the compensatory and punitive components of the Court of Appeals' holding that § 409 authorizes recovery of extracontractual damages"); *ante,* at 138, n. 4; *ante,* at 144 ("[W]e do not find in § 409 express authority for an award of extracontractual damages to a beneficiary"); *ante,* at 148.

[4] See, *e. g., ante,* at 136, 142–144, 146–148.

to traditional trust-law remedies for breaches of those duties, I could not more strongly disagree. As the Court acknowledges in a footnote, *ante*, at 142, n. 9, § 404(a) sets forth the governing standard that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries." [5] That section also provides that, in carrying out these duties, a fiduciary shall exercise "the care, skill, prudence, and diligence" of a "prudent man acting in like capacity." The legislative history demonstrates that Congress intended by § 404(a) to incorporate the fiduciary standards of trust law into ERISA,[6] and it is black-letter trust law that fiduciaries

---

[5] Section 404(a), 88 Stat. 877, as amended, 94 Stat. 1296, 29 U. S. C. § 1104(a), provides in relevant part:

"(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

"(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;

"(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

"(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

"(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title or title IV."

[6] See, *e. g.*, H. R. Rep. No. 93–533, p. 11 (1973) ("The fiduciary responsibility section, in essence, codifies and makes applicable to . . . fiduciaries certain principles developed in the evolution of the law of trusts"); *id.*, at 13:

"The principles of fiduciary conduct are adopted from existing trust law, but with modifications appropriate for employee benefit plans. These salient principles place a twofold duty on every fiduciary: to act in his relationship to the plan's fund as a prudent man in a similar situation and under like conditions would act, and to act consistently with the principles of

owe strict duties running directly to beneficiaries in the administration and payment of trust benefits.[7] The legislative history also shows that Congress intended these fiduciary standards to govern the ERISA claims-administration process.[8]

Moreover, the Court's suggestion concerning the distinction between Parts 4 and 5 of Title I is thoroughly unconvincing. Section 502(a)(3) authorizes the award of "appropriate equitable relief" directly to a participant or beneficiary to "redress" "*any* act or practice which violates *any* provision of this title or the terms of the plan."[9] This section and

administering the trust for the exclusive purposes previously enumerated, and in accordance with the documents and instruments governing the fund unless they are inconsistent with the fiduciary principles of the section."

See also S. Rep. No. 93–127, pp. 28–29 (1973); H. R. Conf. Rep. No. 93–1280, p. 303 (1974) ("[T]he assets of the employee benefit plan are to be held for the exclusive benefit of participants and beneficiaries"); 120 Cong. Rec. 29932 (1974) (remarks of Sen. Williams); *Central States Pension Fund* v. *Central Transport, Inc.*, 472 U. S. 559, 570 (1985) ("Congress invoked the common law of trusts to define the general scope of [fiduciary] authority and responsibility"); *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms"); *Leigh* v. *Engle*, 727 F. 2d 113, 122 (CA7 1984); *Donovan* v. *Mazzola*, 716 F. 2d 1226, 1231 (CA9 1983); *Sinai Hospital of Baltimore, Inc.* v. *National Benefit Fund For Hospital & Health Care Employees*, 697 F. 2d 562, 565–566 (CA4 1982); *Donovan* v. *Bierwirth*, 680 F. 2d 263, 271 (CA2), cert. denied, 459 U. S. 1069 (1982).

[7] See, *e. g.*, Restatement (Second) of Trusts § 182 (1959); G. Bogert & G. Bogert, Law of Trusts § 109 (1973).

[8] See, *e. g.*, 120 Cong. Rec. 29929 (1974) (remarks of Sen. Williams) (emphasis added) (ERISA imposes "strict fiduciary obligations upon those who exercise management or control over the assets or *administration* of an employee pension or welfare plan"); H. R. Conf. Rep. No. 93–1280, at 301, and n. 1 (*re* procedures for delegating fiduciary duties, including "allocation or delegation of duties with respect to payment of benefits").

[9] The Conference Report emphasized that participants and beneficiaries were entitled under § 502 not only to "recover benefits due under the plan"

§ 404(a)'s fiduciary-duty standards both appear in Title I, which is entitled "PROTECTION OF EMPLOYEE BENE-FIT RIGHTS." A beneficiary therefore may obtain "appropriate equitable relief" whenever an administrator breaches the fiduciary duties set forth in § 404(a).[10] Accordingly, an administrator's claims-processing duties and a beneficiary's corresponding remedies are not at all necessarily limited to the terms of §§ 502(a)(1)(B) and 503. In light of the Court's narrow holding, see *ante*, at 139, n. 5, further consideration of these important issues remains open for another day when the disposition of a controversy might really turn on them.

## Judicial Construction of ERISA

Russell argues that a private right of action for beneficiaries and participants should be read into § 409. Because the Court has concluded that Congress' intent and ERISA's overall structure restrict the scope of § 409 to recovery on behalf of a plan, *ante*, at 139–142, such a private right is squarely barred under the standards set forth in *Cort* v. *Ash*, 422 U. S. 66, 78 (1975).[11]

---

and to "clarify rights to receive future benefits under the plan," but also to obtain other "relief from breach of fiduciary duty." *Id.*, at 326–327. See also 120 Cong. Rec. 29933 (1974) (remarks of Sen. Williams) (beneficiaries entitled to recover benefits "as well as to obtain redress of fiduciary violations").

[10] Trust-law remedies are equitable in nature, and include provision of monetary damages. See, *e. g.*, G. Bogert & G. Bogert, Law of Trusts and Trustees § 862 (2d ed. 1982) (hereinafter Bogert & Bogert, Trusts and Trustees); Restatement (Second) of Trusts §§ 199, 205 (1959). Thus while a given form of monetary relief may be unavailable under ERISA for other reasons, see *infra*, at 157–158, it cannot be withheld simply because a beneficiary's remedies under ERISA are denominated "equitable." See also Restatement (Second) of Torts § 874, Comment *b* (1979) ("Violation of Fiduciary Duty") (although "[t]he remedy of a beneficiary against a defaulting or negligent trustee is ordinarily in equity," the beneficiary is entitled to all redress "for harm caused by the breach of a duty arising from the relation").

[11] An implied action for personal recovery is specifically barred under the second and third factors set forth in *Cort* v. *Ash:* "is there any indication of

In disposing of this relatively straightforward issue, the Court makes some observations about the role of courts generally in construing and enforcing ERISA. The Court suggests, for example, that Congress "crafted" ERISA with "carefully integrated" remedies so as to create an "interlocking, interrelated, and interdependent remedial scheme" that courts should not "tamper with." *Ante,* at 146, 147.

The Court's discussion, I say respectfully, is both unnecessary and to some extent completely erroneous. The Court may or may not be correct as a general matter with respect to implying private rights of action under ERISA; as the respondent has sought such an implied right only under § 409,[12] we of course cannot purport to resolve this question in the many other contexts in which it might arise under the statute. Moreover, the Court's remarks about the constrictive judicial role in enforcing ERISA's remedial scheme are inaccurate insofar as Congress provided in § 502(a)(3) that beneficiaries could recover, in addition to the remedies explicitly set forth in that section, "other appropriate equitable relief . . . to redress" ERISA violations. Congress already had instructed that beneficiaries could recover benefits, obtain broad injunctive and declaratory relief for their own personal benefit or for the benefit of their plans, and secure attorney's fees, so this additional provision can only be read precisely as authorizing federal courts to "fine-tune" ERISA's remedial scheme. Thus while it may well be that courts generally may not find implied private remedies in ERISA, the Court's remarks have little bearing on how courts are to go about construing the private remedy that Congress explicitly provided in § 502(a)(3).

---

legislative intent, explicit or implicit, either to create such a remedy or to deny one?," and "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" 422 U. S., at 78.

[12] "Section [502] specifically allows beneficiaries to sue under Section [409]. However, even if it did not, a private right of action for participants and beneficiaries could be read into Section [409]." Brief for Respondent 14; see also *id.,* at 2.

The legislative history demonstrates that Congress intended federal courts to develop federal common law in fashioning the additional "appropriate equitable relief." In presenting the Conference Report to the full Senate, for example, Senator Javits, ranking minority member of the Senate Committee on Labor and Public Welfare and one of the two principal Senate sponsors of ERISA, stated that "[i]t is also intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans." [13] Senator Williams, the Committee's Chairman and the Act's other principal Senate sponsor, similarly emphasized that suits involving beneficiaries' rights "will be regarded as arising under the laws of the United States, in similar fashion to those brought under section 301 of the Labor Management Relations Act." [14] Section 301, of course, "authorizes federal courts to fashion a body of federal law" in the context of collective-bargaining agreements, to be derived by "looking at the policy of the legislation and fashioning a remedy that will effectuate that policy." *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 451, 457 (1957).[15] ERISA's legislative history also demonstrates beyond question that Congress intended to engraft trust-law principles onto the enforcement

---

[13] 120 Cong. Rec. 29942 (1974).

[14] *Id.*, at 29933. See also H. R. Conf. Rep. No. 93–1280, at 327 ("All such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar fashion to those brought under Section 301 of the Labor-Management Relations Act of 1947").

[15] See also *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 688 (1978) (footnote omitted): "Congress . . . did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition. The Rule of Reason, with its origins in common-law precedents long antedating the Sherman Act, has served that purpose." It seems to me that ERISA, with its incorporation of trust law, deserves a similarly generous and flexible construction.

scheme, see n. 6, *supra,* and a fundamental concept of trust law is that courts "will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests."[16] Thus ERISA was *not* so "carefully integrated" and "crafted" as to preclude further judicial delineation of appropriate rights and remedies; far from barring such a process, the statute explicitly directs that courts shall undertake it.

The Court today expressly reserves the question whether extracontractual damages might be one form of "other appropriate relief" under § 502(a)(3). *Ante,* at 139, n. 5. I believe that, in resolving this and other questions concerning appropriate relief under ERISA, courts should begin by ascertaining the extent to which trust and pension law as developed by state and federal courts provide for recovery by the beneficiary above and beyond the benefits that have been withheld;[17] this is the logical first step, given that Congress intended to incorporate trust law into ERISA's equitable remedies.[18] If a requested form of additional relief is

_____

[16] 3 A. Scott, Law of Trusts § 199, p. 1638 (1967). See also Restatement (Second) of Trusts § 205, and Comment *a* (1959) (beneficiary entitled to a remedy "which will put him in the position in which he would have been if the trustee had not committed the breach of trust"); Bogert & Bogert, Trusts and Trustees § 862.

[17] The absence of such relief under traditional trust law is not necessarily dispositive, however, because "in enacting ERISA Congress made *more* exacting the requirements of the common law of trusts relating to employee benefit trust funds." *Donovan* v. *Mazzola,* 716 F. 2d, at 1231 (emphasis added); see also *Sinai Hospital of Baltimore, Inc.* v. *National Benefit Fund for Hospital & Health Care Employees,* 697 F. 2d, at 565–566.

[18] "Where the courts are required themselves to fashion a federal rule of decision, the source of that law must be federal and uniform. Yet, state law where compatible with national policy may be resorted to and adopted as a federal rule of decision. . . . Here, of course, there is little federal law to which the court may turn for guidance. State regulation of insurance, pensions, and other such programs, however, provides a pre-existing source of experience and experiment in an area in which there is, as yet, only federal inexperience. Much of what the states have thus far devel-

available under state trust law, courts should next consider whether allowance of such relief would significantly conflict with some other aspect of the ERISA scheme. In addition, courts must always bear in mind the ultimate consideration whether allowance or disallowance of particular relief would best effectuate the underlying purposes of ERISA—enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries. See *supra*, at 152–153.

I concur in the judgment of the Court.

oped, particularly in the insurance field, is statutory. In certain areas of public concern, the state legislatures have been quite active in enacting comprehensive regulatory schemes, and state statutory sources of law will no doubt play a major role in the development of a federal common law under ERISA, particularly in defining rights under employee benefit plans." *Wayne Chemical, Inc.* v. *Columbus Agency Service Corp.*, 426 F. Supp. 316, 325 (ND Ind.), modified on other grounds, 567 F. 2d 692 (CA7 1977).